Ron TODD, Kansas Commissioner of Insurance, as Liquidator of West General Insurance Company, Inc., Plaintiff,

v.

DEPOSIT GUARANTY NATIONAL BANK, Defendant.

No. 3:92–cv–811WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

April 21, 1994.

Charles Louis McBride, Jr., Daniel J. Mulholland, Jackson, MS, for plaintiff.

J. Stevenson Ray, Jay A. Travis, III, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the motion of the defendant, Deposit Guaranty National Bank (hereinafter "DGNB"), for partial summary judgment pursuant to Rule 56(b)[1] of the Federal Rules of Civil Procedure. At the nucleus of this lawsuit are Safekeeping Agreements entered into by West General Insurance Company, Inc. (hereinafter "West General"), represented here by Ron Todd, Kansas Commissioner of Insurance (hereinafter "Commissioner"); Old Hickory Casualty Insurance Company (hereinafter "Old Hickory"); and DGNB. Pursuant to the Safekeeping Agreements, DGNB agreed with West General and Old Hickory to maintain certain assets vital to the business arrangement between these two parties. In this lawsuit, plaintiff charges that to plaintiff's detriment DGNB failed to monitor the account and allowed Old Hickory to make unauthorized transfers. By its Rule 56(b) motion, DGNB seeks partial summary judgment on the ground that when the Safekeeping Agreements were terminated, West General signed certain releases which, upon DGNB's return of the assets in question, absolved DGNB of any liability relative to the alleged unauthorized transfers under the Safekeeping Agreements. On the other hand, plaintiff Ron Todd, the "Commissioner," alleges that summary judgment is inappropriate because genuine issues of material fact exist regarding: (1) whether DGNB was under a fiduciary relationship with West General to provide a detailed accounting; (2) whether DGNB abused this alleged fiduciary relationship to obtain the releases; and (3) whether West General executed the releases under duress.

Having examined the motion, the response, the rebuttal, exhibits, arguments in memoranda of the parties, and all other relevant submissions of record, the court finds that the defendant's motion is well taken and should be granted for the reasons which follow.

## I. PARTIES AND JURISDICTION

Ron Todd, a citizen of the State of Kansas, is the Kansas Commissioner of Insurance. He brings this action in his capacity as the Liquidator of West General. West General was an insurance corporation organized and existing under the laws of the State of Kansas. Defendant DGNB is a national banking association with its principal place of business in the State of Mississippi.

Inasmuch as the citizens involved in this lawsuit are diverse and the controversy exceeds $50,000.00, the court is satisfied that it has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1).[2] The parties do not

---

1. Rule 56(b) of the Federal Rules of Civil Procedure provides:

    (b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

2. Title 28 U.S.C. § 1332 provides in pertinent part:

    (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—
    (1) citizens of different States; ...

quarrel with the court's jurisdiction, nor with the court's conclusion that pursuant to the dictates of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this action under § 1332 must be guided by the substantive law of the State of Mississippi.

■ In a diversity action such as this, the court is bound to apply Mississippi's conflict-of-laws rules. *Klaxon Co. v. Stentor Elec. Mfg. Co., supra.* To determine which state's law applies to contract disputes such as the one at bar, Mississippi follows the approach of the Restatement (Second) of Conflict of Laws (1971) and considers the following factors *inter alia:* (a) the place of contracting; (b) the place of negotiating the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2)(a)–(e). *See Boardman v. United Servs. Automobile Ass'n,* 470 So.2d 1024, 1032 (Miss.1985) (involving choice of law in an insurance contract dispute); *Crouch v. General Elec. Co.,* 699 F.Supp. 585, 592 (S.D.Miss.1988) (involving breach of contract warranty).

Upon reviewing the facts of this dispute under the above factors, this court is persuaded that Mississippi law will govern the case *sub judice.* The Safekeeping Agreements were executed in Mississippi; the contracts were to be performed in Mississippi; and the safekeeping accounts were maintained in Mississippi by DGNB, a Mississippi corporation. As earlier mentioned, the parties do not dispute this point.

## II. FACTS

West General, a Kansas insurance corporation, and Old Hickory, a Louisiana insurance corporation, entered into several reinsurance agreements under which Old Hickory reinsured certain insurance policies written by West General. In order to ensure Old Hickory's performance under the reinsurance agreements, West General required Old Hickory to maintain assets sufficient to cover its reinsurance obligations to West General in a federally-insured institution. Old Hickory agreed to the contractual condition and chose DGNB as a safekeeping agent for the assets to be set aside by Old Hickory.

DGNB agreed to act as the safekeeping agent of the parties and formalized the agreement by entering into certain contracts with West General and Old Hickory. The agreements relevant to the instant motion became effective on March 24, 1986, September 1, 1988, and November 1, 1988 (collectively the "Safekeeping Agreements"), respectively.

On August 22, 1991, West General received notice that Old Hickory had been placed into conservation by a Louisiana state court. On August 23, 1991, the president of West General flew to Jackson to deliver to DGNB a written demand that DGNB transfer to West General the assets kept under the Safekeeping Agreements. The September 1 and November 1, 1988, Safekeeping Agreements stipulated that West General shall have the right to take possession of the assets deposited with DGNB immediately if one or more events occurred. Among these events were:

A. REINSURER [Old Hickory] fails to fulfill its obligation as REINSURER under the terms of the Reinsurance Agreement described in Paragraph 1 of this Agreement.

B. REINSURER fails to promptly furnish additional assets for deposit when requested by COMPANY [West General].

C. REINSURER dissolves or otherwise terminates its existence.

Sept. 1, 1988 Safekeeping Agreement ¶ 8; Nov. 1, 1988 Safekeeping Agreement ¶ 8.

DGNB did not comply with the written demand, despite the apparent sufficiency of the demand letter under the terms of the Safekeeping Agreements, and despite the fact that DGNB officials were informed that West General would risk financial failure if the assets were not released immediately. *See* J. Ables Dep. at 62–64 (Ex. N, Comm'r Resp. to DGNB's Mot.Part.Summ.J.). Discussions or meetings between senior DGNB officials and West General representatives

occurred on the evening of August 23 and the morning of August 26 involving West General's demand. DGNB officials also met among themselves to discuss some potential issues which now have come to fruition in this litigation.

The bank officers decided on the morning of August 26 to send a letter regarding this whole circumstance to the Louisiana Insurance Commissioner,[3] the Mississippi Insurance Commissioner, and to West General. The letter stated that the assets held by DGNB would be released to West General in forty-eight (48) hours unless DGNB received a court order directing it to do otherwise.

As a result of DGNB's refusal to comply immediately with West General's demand, on that same date, August 26, 1991, West General filed a motion for a temporary restraining order in the Mississippi Chancery Court of the First Judicial District of Hinds County, Mississippi, to compel DGNB to deliver at once the assets held in the safekeeping accounts. That same day, the Chancery Court enjoined DGNB from withholding the assets and ordered DGNB to deliver the assets to West General.

DGNB indicated that it would comply with the injunction but wanted the Receipt Agreements to contain releases. Thus, in accordance with the provisions of the Safekeeping Agreements, West General executed three Agreements of Receipt containing releases (hereinafter "releases")—one for each Safekeeping Agreement—in favor of DGNB. The releases specifically released DGNB "from any and all claims arising under or related to the safekeeping agreements" except for DGNB's handling of certain subordinated debentures of White Enterprises, Inc., in the amount of $200,000.00 (hereinafter "White Debentures").[4]

On February 7, 1992, West General was placed into liquidation by the Commissioner. As a result, the Commissioner, plaintiff herein, has brought this lawsuit as Liquidator of West General. Plaintiff alleges that DGNB breached the terms of the Safekeeping Agreements and willfully breached its fiduciary duty to West General. The Commissioner claims that DGNB allowed Old Hickory to make numerous transfers of assets into and out of the safekeeping accounts without the written consent of West General, as required by the Safekeeping Agreements. As earlier stated, DGNB has moved for partial summary judgment on the releases signed by West General contained in the Agreements of Receipt.

The Commissioner, in opposition, claims that there are three areas of factual dispute which preclude the grant of summary judgment: firstly, whether a fiduciary relationship existed between West General and DGNB which required DGNB to provide West General more notice of these transactions than by simply sending West General monthly account sheets; secondly, whether DGNB abused this alleged fiduciary relationship in order to obtain the releases contained in the Agreements of Receipt; and thirdly, whether West General signed the Agreements of Receipt under duress. The court will also address the additional issues raised by the Commissioner as to whether there was consideration to support the releases, and, if so, whether this consideration was valid.

## III. DISCUSSION

### A. Summary Judgment

■ A moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In response to a summary judgment motion, the adverse party must show that there exists a

---

3. DGNB says it believes that the Louisiana Insurance Commissioner may have had a potentially valid and enforceable claim to the assets being held in the safekeeping accounts.

4. The matter of the "White Debentures" is involved in plaintiff's other claims before this court. Since these debentures were not included in the releases at issue, defendant does not seek summary judgment on these issues. Hence, defendant's motion herein is only for partial summary judgment.

dispute over issues of fact which must be resolved at trial. Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the adverse party is unable to make such a showing, the moving party prevails. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. The credible evidence offered in opposition to the motion is to be believed, and all reasonable inferences are to be drawn in favor of the adverse party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## B. The Alleged Issues of Material Fact

### 1. *Transfers of Assets into and out of the Safekeeping Accounts*

■ The Commissioner argues that at the time West General executed the releases in question, DGNB did not inform West General or its attorney of the "numerous unauthorized transfers of assets into and out of the safekeeping accounts which form the basis of this lawsuit." Comm'r Mem.Br.Supp.Resp. to Mot. for Part.Summ.J. at 15.

In order to assess the merit of this claim, the court turns to the text of the Safekeeping Agreements to see if they address this situation. The Safekeeping Agreement provides that:

The REINSURER [Old Hickory] shall at any time have the right to withdraw from the aforementioned deposit all or any part of the government obligations, corporate obligations or shares of preferred or guaranteed securities, subject to COMPANY [West General] consent. In the event such right is exercised, REINSURER shall, at the time of such withdrawal, replace the withdrawn obligations or securities with other assigned or endorsed obligations or securities which in the COMPANY's sole discretion are of a kind or quality so as to at all times maintain the deposit in an amount equal to the aforementioned policy reserves and outstanding loss reserves on said reinsured policies.

1986 Safekeeping Agreement ¶ 7. The other two Safekeeping Agreements contain similar language regarding pre-withdrawal consent.

Under the Safekeeping Agreements, DGNB was required to provide quarterly accounting statements both to Old Hickory and to West General, as evidence below:

SAFEKEEPING AGENT further agrees to forward a certified list of all securities held under this Agreement to COMPANY and REINSURER as of the end of each calendar quarter, to the attention of:

For COMPANY      VICTOR D. BLAKELY

\*      \*      \*      \*      \*      \*

For REINSURER      A.C. BEROT

\*      \*      \*      \*      \*      \*

1988 Safekeeping Agreement ¶ 11.

Thus, under the Safekeeping Agreements, Old Hickory was permitted to withdraw and substitute assets, but only with West General's consent. As the "safekeeper" under the Agreements, DGNB was required to send accurate quarterly statements of the account to both Old Hickory and West General. Victor Blakely was the person designated in the Agreements to receive the quarterly statements for West General.

The Commissioner has submitted to the court a chart which purports to list the instances of unauthorized transfers by Old Hickory into and out of the safekeeping accounts. *See* Charts attach'd to Pl.'s Resp. to Def.'s 1st Set of Interrogs. (Ex. V, Comm'r Resp. to DGNB's Mot. for Part.Summ.J.). However, it is undisputed that West General had full knowledge of the alleged unauthorized transfers at the time West General executed the releases. The depositional testimony and answers to interrogatories reveal that Mr. Victor Blakely, the former president of West General, duly received quarterly accounting statements of the safekeeping accounts. *See* V. Blakely Dep. at 40–41, 85–89, 104, 112 (Tab M, DGNB's Mot.Part.Summ. J.); Comm'r Resp.Interrogs. Nos. 4 & 5 (Ex. V, Comm'r Resp.DGNB's Mot.Part.Summ. J.). The proof clearly shows that Mr. Blakely was aware of certain "unauthorized" transfers as early as 1988 and 1989, well before

the subject releases were executed, and afterwards. *See* V. Blakely Dep. at 104, 112.

Plaintiff does not contend that these accounting statements were in error or misleading. Instead, plaintiff incredibly argues that these statements, accurate though they were, were simply not enough to satisfy DGNB's fiduciary duty, that DGNB was required to do more. Even if a fiduciary relationship existed, which this court need not address, and which is admitted by defendant solely for this motion, this court is persuaded that DGNB did all that was required under the Safekeeping Agreements. Through the quarterly statements, West General was advised of all withdrawals or substitutions of assets. While the Safekeeping Agreements gave West General the prerogative to object to any of these transactions, West General chose to remain mute. Clearly, DGNB could reasonably construe this silence as consent. Surely DGNB was warranted in concluding that West General was competent to decipher quarterly accounting statements and to discern whether West General was prejudiced by any withdrawals or substitutions of assets by Old Hickory. This court holds, then, that since West General was aware of the potential claims it might be compromising by signing the releases, the Commissioner may not now complain that the unauthorized transfers were not disclosed and that the releases are invalid.

There is a related argument which the court needs to address—the issue of fraud. The Commissioner argues that DGNB had an affirmative duty to reveal to West General the unauthorized transfers into and out of the safekeeping accounts. The Commissioner cites in support of this contention the case of *Van Zandt v. Van Zandt*, 86 So.2d 466, 470 (Miss.1956). This case stands for the proposition that when a fiduciary fails to disclose facts which ought to have been disclosed, the non-disclosing party has committed fraud.

This court first notes that this claim is out of place here. The discussion above shows that DGNB did disclose the targeted transactions. Secondly, the claim of fraud has not been pleaded in the Commissioner's complaint. To be pleaded properly, fraud must be pleaded with the specificity required under Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiff's fraud allegation has been raised solely in plaintiff's Memorandum Brief in Support of Response to Motion for Partial Summary Judgment. Hence, this claim is not properly before the court.

### 2. *Existence of A Fiduciary Duty*

The Commissioner contends that there is a genuine issue of material fact which can only be determined by a trier of fact regarding the existence of a fiduciary relationship between West General and DGNB. The Commissioner correctly cites the relevant factors under Mississippi law used to determine the existence of a fiduciary relationship. The factors are:

(1) whether the activity of the parties goes beyond their operating on their own behalf and the activity is for the benefit of both:

(2) whether the parties have a common interest and profit from the activities of the other:

(3) whether the parties repose trust and confidence in one another; and

(4) whether one party has the power to control or dominate the other.

*Carter Equipment v. John Deere Indus. Equipment*, 681 F.2d 386, 392 (5th Cir.1982); *Jackson Rapid Delivery Serv., Inc. v. Jones Truck Lines, Inc.*, 641 F.Supp. 81, 84 (S.D.Miss.1986).

Drawing all reasonable inferences in favor of the Commissioner, the court will presume, without deciding, that a fiduciary relationship existed between the parties to this action. Such a presumption takes this case out of the realm of contract between disinterested parties and places it squarely within the realm of contract between fiduciaries. Different contract principles govern contracts between these two types of parties. *See, e.g., Lee v. Wal–Mart Stores, Inc.*, 943 F.2d 554, 556–60 (5th Cir.1991) (discussing the differing contract principles applied to releases between disinterested parties and fiduciaries under Texas law); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481–83 (6th Cir.1989) (discussing the federal common law of releases between fiduciaries); *cf. Fornea v. Goodyear*

*Yellow Pine Co.*, 181 Miss. 50, 178 So. 914, 918 (1938) (holding that in absence of a fiduciary relationship, the court cannot relieve a person from the consequences of contracts entered into imprudently or haphazardly).

■ The court cautions, however, that a factual dispute over the existence of a fiduciary relationship does not take this case out of the realm of partial summary judgment. A release executed between fiduciaries may be totally valid and enforceable. *See* Restatement (Second) of Contracts § 173. If the contract is on fair terms and all parties interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know, a valid release between fiduciaries may be had. *Id.* Thus, the issue relevant to this motion is whether the purported fiduciary relationship was abused in such a way as to invalidate the releases. However, as stated previously in this opinion, it is undisputed that West General was fully aware of the claim it was compromising when it signed the subject releases. The Commissioner has not shown how the existence of a fiduciary relationship blunts the defendant's motion for partial summary judgment.

### 3. *Claim of Duress*

■ The law of Mississippi recognizes the contractual defense of duress.

[T]o invalidate a contract on grounds of economic duress, the complaining party must establish: (1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will.

*Kelso v. McGowan*, 604 So.2d 726, 732 (Miss. 1992) (citing *Duckworth v. Allis–Chalmers Mfg. Co.*, 247 Miss. 198, 150 So.2d 163 (1963)). This court holds that the Commissioner's duress claim fails on both prongs of the above test.

■ In keeping with the *arguendo* presumption that a fiduciary relationship exists, the court will assume, for present purposes, that DGNB was the dominant party in this transaction. While the court recognizes that

DGNB had no right to withhold the assets once Old Hickory went into conservation, or after the chancellor's ruling, *cf. Kelso*, 604 So.2d at 732, DGNB did have a contractual right to demand the releases contained in the Receipt Agreements. Under the Safekeeping Agreements, once DGNB released the assets upon demand, the:

SAFEKEEPING AGENT [DGNB] shall be under no liability for any delivery made by it pursuant to written demand of COMPANY and SAFEKEEPING AGENT shall be fully protected in acting in accordance with such written demand of COMPANY [West General]. *COMPANY shall execute such receipts and the releases for such certificates or documents as may be required by SAFEKEEPING AGENT and REINSURED for the protection of all parties concerned.* SAFEKEEPING AGENT'S responsibility hereunder is limited to the safe holding of the assigned certificates and documents forming the aforementioned deposit and SAFEKEEPING AGENT shall be liable only for its gross negligence, willful misconduct, or lack of good faith.

Sept. 1 & Nov. 1, 1988 Safekeeping Agreements ¶ 9 (emphasis supplied). Thus, DGNB had a right to demand the releases that West General eventually executed. West General yielded to this demand. Under these circumstances, there can be no duress. *See Rivervalley Co. v. Deposit Guaranty Nat'l Bank*, 331 F.Supp. 698, 706–07 (N.D.Miss.1971) (holding that it is not sufficient that one party insist on a legal right and the other party yields to such insistence).

Nor has plaintiff met the second prong of the test for duress. Plaintiff has failed to show that DGNB exerted any coercion to obtain the releases. This court finds instead that West General's decision was the result of a free exercise of choices. There can be no overriding of volition if the complaining party has free exercise of choices. *See id.* West General considered and rejected the option of refusing to tender the releases and returning to the Chancery Court to secure a return of the money after DGNB insisted upon the releases. *See* Cavanaugh Dep. at 64–65 (Ex. G, Comm'r Resp. to DGNB's Mot.

for Part.Summ J.); Blakely Dep. at 108–09 (Ex. G). Thus, because the releases were executed fairly and with full knowledge of the potential claims, this court finds that there was no duress as a matter of law.

██ The Commissioner next argues that by demanding the release, DGNB violated the temporary restraining order. The theory here is that DGNB violated the letter and the spirit of the injunction by insisting upon releases in the Agreements of Receipt. However, the chancellor's order did not address the issue of releases. This was a matter governed by the express terms of the Safekeeping Agreements. The chancellor's injunction did not rescind or otherwise vitiate the requirement that releases be executed.

██ The Commissioner further argues that by demanding the releases in question, DGNB breached its implied duty of good faith and fair dealing. *See* Restatement (Second) of Contracts § 176 (stating that a threat is improper if the threat is a breach of duty of good faith and fair dealing under a contract with the recipient). However, it was not improper for DGNB to demand a release in exchange for turning over the assets in the safekeeping accounts. Thus, DGNB's insistence upon releases was neither improper nor a breach of good faith and fair dealing.

### 4. *Sufficiency of Releases*

██ The court notes at the outset that the Commissioner's complaint does not assert that the Receipt Agreements are void for lack of consideration. However, the issue is raised for the first time in the Commissioner's response to the subject summary judgment motion. The Commissioner contends that a promise to do that which the promisor is already bound to do is insufficient consideration and unenforceable. *See Joe T. Dehmer Distributors, Inc. v. Temple,* 826 F.2d 1463, 1467 (5th Cir.1987); *Associates Discount Corp. v. Southern Equipment sales, Inc.,* 223 F.Supp. 837 (S.D.Miss.1962); *Leggett v. Vinson,* 155 Miss. 411, 124 So. 472 (Miss.1929).

The court is unpersuaded that there was a lack of consideration to support the releases contained in the Receipt Agreements. The recitals in the Safekeeping Agreements clearly outline the consideration. DGNB was being paid by Old Hickory to maintain the assets in safekeeping. This consideration, until now, has never been questioned. Thus, there is no doubt that the existence of consideration under the Safekeeping Agreements may serve as consideration for the releases contained in the Receipt Agreements.

[A] single consideration may support several counter-promises made by the other party to the transaction. While the consideration for one contract will not support a distinct and independent contract, *where two instruments are executed as part of the same transaction, the benefit accruing to one of the parties in one instrument may be the consideration for the promise of such party in the other.*

*Thorton Bros., Inc. v. Gore,* 252 Miss. 27, 172 So.2d 425, 429 (1965) (quoting 17 C.J.S. *Contracts* § 71, at 753–54 (1963)) (emphasis in original). *See also C & D Inv. Co. v. Gulf Transp. Co.,* 526 So.2d 526, 530 (Miss.1988) (holding that consideration given in "master" contract may serve as consideration for subsidiary contracts).

██ The court is satisfied that the releases executed between these parties were completely bargained for and valid. There is no need to resort to parol evidence in order to reach this conclusion. *See Smith v. Falke,* 474 So.2d 1044, 1046 (Miss.1985) (holding that where writing is clear, parol evidence may not be used to contradict the written language). The intention of the parties may be gleaned solely from the wording of the contract. *See Dennis v. Searle,* 457 So.2d 941, 945 (Miss.1984) (holding that the meaning and effect of an unambiguous contract are questions of law to be determined by the court).

### CONCLUSION

Under the Safekeeping Agreements, DGNB had the contractual right to require the releases. The releases at issue do not exceed the provisions of the Safekeeping Agreements. The releases are clear and manifest West General's intent to release

DGNB from any liability regarding its conduct questioned here. Under the undisputed facts and applicable law, this court finds no instance of coercion or duress. Nor does the court find any material issue of disputed fact which would defeat defendant's motion for partial summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, the court hereby grants partial summary judgment in favor of DGNB and against the Commissioner. The remainder of this action will be set for trial on the court's June 13, 1994, trial calendar.

**SO ORDERED AND ADJUDGED.**